UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY EDWARD OLIVER,

        Plaintiff,

  -v-                          Case No. 16cr-407

JOHN WETZEL, JAMES ECKARD,

ERIC TICE, L. OLIVER,

KEVIN KOHLMAN, MARK MCCONNEL,

MICHAEL GOMES, AMY HIMES,

CHRIS COOK, J. SMART,

S. TREWEEK, G. YOHN, C. KYLE,                FILED

J. STEVENS, and JOHN DOE,                     SCRANTON

sued in their individual and                 MAR 08 2016

official capacities,

                                                           Per_____

        Defendants.                                 DEPUTY CLERK

I. Complaint

Plaintiff, Anthony E. Oliver, pro se, states as follows:

Introduction

This is a civil rights action filed by Anthony E. Oliver, a state prisoner, for damages and injunctive relief under 42 U.S.C. § 1983, alleging deliberate indifference toward serious medical needs, the involuntary exposure to environmental tobacco smoke ("ETS") in violation of the Eighth Amendment to the United States Constitution, officially sanctioned retaliation and harassment, including the fabrication of facility misconduct reports and confinement in the Restricted Housing Unit ("RHU") in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and the denial of seizure medication while in the RHU as a punishment for

utilizing the Department of Corrections' ("DOC") facility grievance procedure. The plaintiff also alleges conspiracy against rights and deprivation of rights under the color of law, and the state torts of assault, negligence and official oppression.

## II. Parties, Jurisdiction and Venue

1. The Court has jurisdiction over plaintiff's of violation of federal constitutional rights under 42 U.S.C. §§ 1331(1) and 1343.

2. The Court has supplemental jurisdiction over plaintiff's state law tort claims under 28 U.S.C. § 1367.

3. The plaintiff, Anthony E. Oliver, was confined in the State Correctional Institution at Huntingdon (SCI-Huntingdon), located at 1100 Pike Street, Huntingdon, PA 16654-1112. Plaintiff is currently confined at SCI-Huntingdon.

4. Plaintiff Anthony E. Oliver is and was at all times mentioned herein an adult citizen of the United Kingdom of Great Britain and Northern Ireland.

5. Defendant John Wetzel is and was at all relevant times the Secretary of Corrections.

6. Defendant Eric Tice is and was at all relevant times the facility manager of the prisoner.

7. Defendant Tice is in charge of the daily operations of the prison.

8. Defendant James Eckard was at all relevant times herein the deputy facility manager or acting facility manager of the prison.

8. Defendant L. Oliver is and was at all relevant times herein the deputy superintedent of the prison.

9. Defendant Oliver is in charge of facilities management at the prison.

10. Defendant Kevin Kolhman is and was at all relevant times herein an

employee of the prison.

11. Defendant Kolhmen is employed as a doctor.

12. Defendant Mark McConnell is and was at all relevant times herein an employee of the prison.

13. Defendant McConnell is employed as a physician's assistant

14. Defendant Michael Gomes is and was at all relevant times herein an employee of the prison.

15. Defendant Gomes is employed as a physician's assistant.

16. Defendant Amy Himes is and was at all relevant times herein an employee of the prison.

17. Defendant Himes is employed as a hearing examiner.

18. Defendant Chris Cook is and was at all relevant times herein an employee of the prison.

19. Defendant Cook was employed as an acting unit manager or corrections counselor.

20. Defendant J. Smart is and was at all relevant times herein an employee of the prison.

21. Defendant Smart is employed as a corrections officer II.

22. Defendant S. Treweek is and was at all relevant times herein an employee of the prison.

23. Defendant Treweek is employed as a corrections officer II.

24. Defendant G. Yohn is and was at all relevant times herein an employee of the prison.

25. Defendant Yohn is employed as a corrections officer II.

26. Defendant C. Kyle is and was at all relevant times herein an employee of the prison.

27. Defendant Kyle is employed as a corrections officer II.

28. Defendant J. Stevens is and was at all relevant times herein an employee of the prison.

29. Defendant Stevens is employed as a corrections officer I.

30. This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

31. Plaintiff's claims for injunctive relief are authorized by Rule 65 of the Federal Rules of Civil Procedure.

30. This cause of action arose primarily in the Middle District of Pennsylvania. Therefore, venue is proper under 28 U.S.C. § 1391(b).

### III. Previous Lawsuits by Plaintiff

33. Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his imprisonment.

### IV. Statement of Claim

34. At all relevant times herein, defendants were "persons" for purposes of 42 U.S.C. § 1983 and acted under the color of law to deprive plaintiff of his constitutional rights, as set forth more fully below.

### V. Statement of Facts

35. On 15 December, 2015, plaintiff returned to his assigned prison cell from a facility pass and discovered that another prisoner had been assigned to the cell.

36. Plaintiff has a seizure disorder, and cigarette smoke frequently triggers his seizures.

37. Because plaintiff's new cell mate was smoking, plaintiff reported this to J. Stevens.

38. Stevens asked plaintiff "[w]ill you accept cellie?"

39. Because refusing to accept a cell assignment or a cell mate would result in a facility misconduct, plaintiff accepted cell mate.

40. At approximately 17:40 P.M., plaintiff experienced an aura and lightheadedness due to ETS exposure caused by his cell mate's continued smoking.

41. Plaintiff reported to the officer's desk and requested to be seen by the medical department. Sergeant G. Yohn was at the desk; Stevens was not on the Block.

42. Yohn telephoned the medical department and reported that "Oliver does not like his cellie," and after a brief conversation with medical staff, issued a pass.

43. Upon returning from the medical department at 18:10 P.M., plaintiff requested protective custody, having explained to Yohn that "repeated exposure to" ETS would continue to trigger plaintiff's seizures, and that his cell mate was a smoking tobacco user.

44. Yohn ordered plaintiff to the Center Control, and 15 minutes later, plaintiff was escorted to the RHU. At approximately 20:10 P.M., plaintiff received a misconduct report; written by Stevens, for having refused an order -- refused to accept a cell mate.

45. On 18 December, 2015, plaintiff was given a misconduct hearing held by Amy Himes, Hearing Examiner ("HEX").

46. Despite plaintiff having submitted a written version -- which indicated that Stevens was not on the Block -- and a request for witnesses, Himes declined to conduct an investigation or call any of plaintiff's witnesses.

47. Himes found plaintiff guilty of the misconduct, and stated she

"believe[d] CO Stevens' written report that Inmate Oliver did refuse to obey an order when he refused an order to accept a cellmate. A preponderance of evidence exists to support the #35 charge."

48. Plaintiff appealed HEX's finding of guilt to the Program Review Committee ("PRC").

49. PRC upheld the HEX's decision, and stated "you claim that you didn't refuse a cellie, but you only refused to take a cellie who smokes."

50. However, this is incorrect, where plaintiff specifically stated (in his written version) he "accept[ed] the cellmate (a smoking tobacco user) ... [and] reported the cellmate's smoking tobacco use."

51. In upholding the HEX's decision, PRC stated "[s]moking in any cell is prohibited, therefore this is not a reason to refuse a cellie," with PRC also declining to conduct an investigation of the facts.

52. Plaintiff appealed PRC's determination to the facility manager; Eric Tice, who likewise upheld the HEX's decision, and stated "I have reviewed the documents associated with this misconduct, and I find there is no indication you requested witnesses or a video review," despite plaintiff having the RHU officer with a completed and signed witness form, and in plaintiff's appeal to PRC, having requested a review of the surveillance video.

53. Tice did not deny that "the hearing examiner relied solely on the written misconduct report rather than interviewing witnesses or conducting an investigation [as] the evidence provided in the misconduct report is sufficient to support the hearing examiner's decision."

54. On 15 January, 2016, Plaintiff was released from the RHU. Stevens confirmed advised plaintiff that Yohn ordered him to fabricate misconduct against him.

55. On 26 January, 2016, plaintiff submitted an appeal to the Office of the Chief Counsel.

56. In a letter dated 9 February, 2016, Joseph H. Dupont stated "(t)he issues you raised on Final Review have already been addressed ... I find no persuasive basis from which to conclude that the Examiner erred in conducting the hearing ... The procedures followed were in complete accordance with DC-ADM 801."

* * * * * * *

57. On 21 January, 2016, plaintiff was moved from "B" Block to "DA" Block.

58. Because plaintiff is on the chronic care list and being treated for seizure and migraine disorders, he is permanently classified for "bottom-tier/bottom-bunk" status.

59. However, Stevens assigned plaintiff to the second tier despite being aware of plaintiff's medical disorders and cell requirements.

60. Plaintiff advised Stevens and J. Smart of his medical status, as well as his medical orders related to that status.

61. Smart ordered a prisoner to prepare to move out of a cell on the first tier so that plaintiff could move in to it, and called the medical department to "verify" plaintiff's medical condition and orders.

62. After prisoner had packed and was ready to move, Smart ordered him to stay in the cell and ordered plaintiff to move into a cell on the second tier, then stated the medical department confirmed his bottom-bunk status but not his bottom-tier status, despite both statuses being otherwise permanent.

63. Smart stated that plaintiff had to "sign up for 'sick-call' to 're-new'" medical orders related to health issues as they impact on cell

assignments.

64. Plaintiff submitted a sick-call slip, and was seen by Mark McConnel.

65. Plaintiff discussed issues related to ETS exposure and his "cell assignment" with McConnel, who stated "this is a non-smoking facility," and that plaintiff "should discuss housing issues with unit management staff."

66. Plaintiff requested policy regarding treatment related to ETS exposure, and McConnell reiterated that "this is a non-smoking facility, and there is no policy for treating [ETS] exposure," and renewed plaintiff's bottom-bunk/bottom-tier status.

67. Plaintiff had to wait one (1) week for "new medical orders" to be approved by the deputy superintendent of facilities management (DSFM), but suffered four (4) seizures in the interim.

68. Plaintiff reported this, as well as the continued use of smoking tobacco products by both prisoners and staff on the prison Block to L. Oliver and Raymond Moore, DSFM.

69. Plaintiff also reported that Stevens verified Yohn ordered him to fabricate a misconduct report and remove all references that plaintiff had accepted another smoking-tobacco using cell mate, because prisoner was smoking in the cell plaintiff suffered ETS related illnesses, and to conceal evidence of prisoner's smoking and to confiscate plaintiff's legal and medical materials.

70. Oliver and Moore reiterated what McConnell had told plaintiff, that "this is a non-smoking facility," but that they would "look into it."

71. On or about 20 January, 2016, plaintiff saw Deputy Oliver and reiterated his concerns regarding "D" Block, and asked about single-cell status to avoid cell assignment complications, where inmates and other prisoners had expressed animosity about plaintiff causing problems about

them smoking on the Block.

72. Oliver said she would make some inquires regarding single-cell status, but plaintiff was moved to "DA" Block the next day.

* * * * * * *

73. On 13 March, 2013, C. Kyle was directed by Chris Cook to remove inmate who regularly used smoking tobacco products from plaintiff's assigned cell.

74. Kyle removed inmate, but then deliberately, and with reckless disregard for plaintiff's health, ignored Cook's directions, and selected an inmate whom he knew to be a smoking tobacco user, had a personal animosity against, as well as several disagreements with, and assigned him to plaintiff's assigned cell, despite having been aware of plaintiff's specific medical conditions and desire not to be placed with cigarette smokers.

75. On 18 March, 2013, plaintiff filed a facility grievance which was subsequently denied.

76. Plaintiff exhausted facility grievance procedures, and on 14 May, 2013, submitted a timely appeal to Central Office for final review.

77. On the same day, Dorina Varner mailed plaintiff an previously prepared action having denied relief, which stated, inter alia, "Eckard conducted an investigation ... [t]he record reflects that ... you were placed with three cellmates who smoked ... [y]ou have failed to provide evidence to substantiate your claims ... [y]ou state that D Block staff declines to report your complaints of excessive ETS ... if you are having medical issues, you need to sign up for sick call."

* * * * * * *

78. On 13 February, 2013, plaintiff submitted a Request to Staff form

("Request") to Chris Cook related to Kyle's refusal to enforce the no-smoking policy on the Block, as well as Kyle's harassing behaviour.

79. On 14 February, 2013, Cook responded back, and stated that he would "talk to them about the smoking issue. As far as you claiming he is harassing you, you have failed to provide me with any documentation," despite Cook acknowledging that Kyle assigned three (3) known smoking tobacco users in the cell with plaintiff after removing a smoking tobacco user.

81. On 11 March, 2013, plaintiff submitted a sick-call form to be seen by the medical department.

80. Then again on 12 March, 2013, plaintiff was seen by the medical department where a nurse took statistical health data related to plaintiff's headache symptoms, including seizure activity, migraine pain, nausea, cell mate's smoking, and advised plaintiff "to talk to block officer about cellie smoking[,]" but was told that "this is a non-smoking facility and policy says we can't treat smoking related [health] problems."

82. However, on 13 March, 2013, plaintiff again reported to the medical department for the same problems, i.e., seizure, headache, vomiting, and was told to sign up for sick-call, with a notation placed in plaintiff's file that "[inmate] seen the day before and instructed to sign up for sick call. [Inmate] did not sign up for [sick-call]."

83. On 20 March, 2013, plaintiff submits another sick-call slip, and sees Tanya Chew, who stated that plaintiff "presented to sick call requesting single cell ... due to seizure activity," but falsely reported that plaintiff claimed that his cell mate -- at that time -- smoked.

84. Plaintiff again was seen by Chew on 27 March, 2013 for symptoms related to ETS related exposure, and wanted to treat symptoms with "saline

nasal spray", or "NSAIDS" -- which plaintiff has an allergy to.

85. Chew also advised plaintiff he could not be moved to a Block with "less smoke" because "this is a non-smoking facility."

86. On 13 March, 2013, plaintiff sent a Request to B.L. Harris, captain of security, advising him that staff on DA Block were refusing to enforce the "no smoking" policy, staff was informing several inmates plaintiff was "causing trouble" about staff allowing inmates to smoke, and that Kyle stated "[he] cannot stop inmates from smoking."

* * * * * * *

87. On 3 May, 2013, plaintiff was seen by Mark McConnell, for, inter alia, diet issues, but requested to also discuss concerns regarding plaintiff's migraines due to ETS exposure.

88. However, because plaintiff did not specify specifically he wanted to discuss "migrains pain" on the sick call form, McConnell said he would not discuss issue, and that he cannot treat ETS-related symptoms because "this is a non-smoking facility."

89. On 23 October, 2013, plaintiff signed up for sick call related to symptoms from ETS exposure, however, he was not called to the medical department to be seen.

90. Plaintiff had a seizure at approximately 01:30 A.M. on 15 November, 2013 after having breathed cigarette smoke that was wafting into the cell for several minutes, and was seen by the medical department, where he reported urinary incontinence, migraine, and continued aura.

91. Plaintiff was told to continue to take his seizure medication -- among other things, but that there was nothing that could be done about the cigarette smoke because "we can't treat smoking related issues because this

is a non-smoking facility."

92. On 6 December, 2013, plaintiff was seen by Michael Gomes, who documented, among other things, plaintiff's migraines, confirmed that he could not treat ETS-related symptoms due to facility policy "because this is supposed to be a non-smoking facility," and to "speak with Block officers."

93. On or about 8 December, 2013, plaintiff reported continued use of smoking tobacco products by both prisoners and staff to Cook, and the fact that plaintiff was continuing to suffer from ETS-related illnesses as a result.

94. Cook became very angry and said to plaintiff "I don't know how you ever made it in the world," then told Block officers that plaintiff "doesn't get anything."

* * * * * * *

## Count One: Breach of Duty to Protect

95. Defendants exercised deliberate indifference to plaintiff's health and safety when they willfully exposed him to unreasonably high levels of ETS that seriously threatened his present and future health. Defendants received repeated requests, oral and in writing, from plaintiff for an accommodation to a population Block with less ETS to mitigate exposure, or a transfer to a non-smoking facility (e.g., SCI-Chester), but defendants refused and retaliated by fabricating misconduct reports. Defendants' deliberate indifference was also demonstrated when they stated "this is a non-smoking facility," but sells tobacco products, then enforces an unpublished policy that prohibits treatment of ETS-related illnesses when plaintiff suffers from ETS exposure.

96. Defendant S. Treweek exercised deliberate indifference to plaintiff's

health and safety when he, for no reason, and without medical authorization, overrode plaintiff's bottom-bunk/bottom tier status and moved him from the bottom tier to the second tier top-bunk with a smoking tobacco user. Plaintiff had a seizure attempting to ascend to the top-bunk and fell, resulting in an injury to his lower back, as well as an impact to his head causing diminished hearing and vision. Plaintiff was subsequently issued a fabricated misconduct and conveyed to the RHU and denied seizure medication.

97. Defendant J. Smart exercised deliberate indifference to plaintiff's health and safety when he, for no reason, and without medical authorization, moved plaintiff to the second tier, despite Smart being aware that plaintiff had been permanently classified as bottom-bunk/bottom-tier status, but nevertheless exposed him to further injury, where plaintiff continued to suffer from seizures, and where plaintiff was not moved to the bottom tier until one (1) week later.

99. As a result of deliberate indifference exercised by aforementioned defendants, plaintiff suffered serious injury, as a result of continued exposure to high levels of ETS exposure, including increased seizure activity, lower-back injury, diminished vision and hearing, migraine headaches, and vomiting.

### Count Two: Retaliatory Treatment for Filing

### Grievances and Seeking Medical Care

100. Defendant Dr. Kevin Kohlman exercised deliberate indifference to plaintiff's health by failing to provide adequate medical care to him as a result of plaintiff's exposure to unreasonably high levels of ETS. Defendant Kohlman intentionally did not order reasonable "housing" accommodations or separations or transfer plaintiff to a non-smoking

facility to protect him from the apparent harmful effects of ETS exposure. Kohlman ignored plaintiff's requests for treatment of ETS-related illnesses, and justified denial of treatment based on "canned" policy positions and statements, including that "this is a non-smoking facility."

101. As a result of Defendant Kohlman's deliberate indifference to plaintiff's condition, plaintiff suffered, and continues to suffer from, seizures, migraines, nausea, vomiting, back-pain, and diminished vision and hearing. Moreover, Defendant Kohlman failed to properly supervise Defendants McConnell and Gomes.

102. Defendant Mark McConnell exercised deliberate indifference to plaintiff's health by failing to provide adequate medical care to him as a result of plaintiff's exposure to unreasonably high levels of ETS. Defendant McConnell diminished the harm caused by ETS, denied that prisoners smoked within the facility, and intentionally did not order reasonable "housing" accommodations or separations or transfer plaintiff to a non-smoking facility to protect him from the harmful effects of ETS exposure.

103. McConnell ignored plaintiff's requests for treatment of ETS-related illnesses, and justified denial of treatment based on "canned" policy positions and statements, including that "this is a non-smoking facility."

104. Defendant Michael Gomes exercised deliberate indifference to plaintiff's health by failing to provide adequate medical care to him as a result of plaintiff's exposure to unreasonably high levels of ETS. Defendant Gomes did not order reasonable order reasonable "housing" accommodations or separations or transfer plaintiff to a non-smoking facility to protect him from the harmful effects of ETS exposure.

105. Defendant Gomes ignored plaintiff's requests for treatment of ETS-

related illnesses, and justified denial of treatment based on "canned" policy positions and statements, including that "this is a non-smoking facility."

* * * * * * *

106. Defendants James Eckard and Eric Tice exercised deliberate indifference to plaintiff's health and safety where defendants knew plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. Defendants Eckard and Tice are aware of the health risks posed by involuntary exposure to ETS, but nevertheless encourage and enforce a local policy not to treat illnesses caused by exposure to ETS. Defendants Eckard and Tice's deliberate indifference was also demonstrated when they acknowledged that prisoners do smoke inside the facility, but plaintiff should report it, despite plaintiff having been retaliated against by both prisoners and staff for having done so in the past, then taking no further actions.

107. Defendant John Wetzel exercised deliberate indifference to plaintiff's health and safety by failing to protect him from the harmful effects of ETS exposure. Plaintiff exhausted several grievances by submitting appeals to the Secretary's Office of Inmate Grievances and Appeals, all of which were subsequently denied. Plaintiff notified Wetzel on 6 May, 2013, of his intent to sue for, inter alia, injuries suffered as a result of his exposure to ETS. Wetzel's deliberate indifference is also demonstrated where he directed prison officials at SCI-Huntingdon to engage in a campaign of harassment and retaliation to dissuade plaintiff from further utilizing facility grievance procedures or to file a civil complaint related to the ETS issue.

* * * * * * *

## Conclusion

108. These acts represent a pattern of deliberate indifference, intentional retaliation, and harassment against plaintiff by defendants for filing grievances and seeking medical treatment for illnesses resulting from ETS exposure and have caused plaintiff further mental anguish as well.

WHEREFORE, Anthony E. Oliver prays for judgment in his favor and damages in his favor against all defendants in an amount sufficient to compensate for injuries, pain, and mental anguish suffered by him due to the deliberate indifference and intentional misconduct of defendants, but in no event less than $1,250,000, together with his attorneys' fees and costs, and such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/Anthony E. Oliver
Anthony E. Oliver, Plaintiff

Anthony E. Oliver
DOC No. KG8495
1100 Pike Street
Huntingdon, PA 16654

4 March, 2016

Maria E. Elkins, Clerk of Courts
United States District Court
For the Middle District of Pennsylvania
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148

Re: Section 1983 complaint

Dear Ms. Elkins:

Enclosed please find plaintiff's pro se § 1983 complaint and order to cause for preliminary injunction and temporary restraining order.

Please file, docket, and forward a time-stamped copy for my records.

Your consideration is appreciated.

Sincerely yours,

Anthony E. Oliver

Cc: File

Enclosures

Name Anthony E. Oliver
Number KG8495
1100 Pike Street
Huntingdon, PA 16654-1112

Inmate Mail - PA DEPT OF CORRECTIONS

To: Maria E. Elkins, Clerk of Courts
United States District Court for the
Middle District of Pennsylvania
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148



7012 3050 0000 3688 8825