IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY EDWARD OLIVER, | : | Civil No. 3:16-cv-0407 |
| Plaintiff | : | (Judge Munley) |
| v. | : | |
| JOHN WETZEL, *et al.*, | : | |
| Defendants | : | |

## MEMORANDUM

Anthony Edward Oliver ("Oliver"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), at all times relevant, housed at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"), Pennsylvania, filed the instant civil rights complaint pursuant to 42 U.S.C. § 1983, asserting claims stemming from his involuntary exposure to environmental tobacco smoke ("ETS"). (Doc. 1). The matter is proceeding *via* an amended complaint filed by Oliver on May 10, 2016. (Doc. 27).

Presently pending is a motion (Doc. 103) for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed on behalf of remaining DOC Defendants Oliver, Smart, Treweek, Yohn and Stevens on the claims contained in Counts One and Three, both of which survived Defendants' motion to dismiss. (Doc. 89, ¶ 2). The subject of this Memorandum is limited to Defendants' argument that they are entitled to an entry of judgment in their favor based on Oliver's failure to properly exhaust his administrative remedies. For the reasons set forth below, the motion will be granted.

**I.      Standard of Review**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R. CIV.P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id.; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate

specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); Wooler v. Citizens Bank, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex,.477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" Picozzi v. Haulderman, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.     Statement of Material Facts

At all times relevant, Oliver was incarcerated at SCI-Huntingdon. (Doc. 104, ¶ 1; Doc. 135, ¶ 1; Doc. 131, ¶ 2; Doc. 133-1, ¶ 2). Also, at all times relevant, Defendant Oliver was employed as the Deputy Superintendent for Facilities Management at SCI-

Huntingdon, and Defendants Smart, Stevens, Treweek, and Yohn were employed as corrections officers at SCI-Huntingdon. (Id. at 2, 3; Id. at 2, 3; Id. at 3; Id. at 3).

The DOC's Clean Indoor Air Act policy ("the policy") provides "[a]s of September 11, 2008, smoking is not permitted in any [DOC] building" and "may be permitted only at designated outdoor locations." (Id. at 4-6 citing Policy 1.1.7, Sections 1.A.2 and 1.A.3; Id. at 5, 6; Id. at 5; Id. at 5). Section 1.A.6 of the policy provides "[i]nmate violations will be addressed in accordance with policy 4.1.1 Human Resources and Labor Relations." (Doc. 104, ¶ 7; Doc. 135, ¶ 7). The DA-Unit [at SCI-Huntingdon] Rules and Regulations in effect on January 23, 2015, state "DA-Block is a tobacco free and smoke free Unit. The use of tobacco products is not permitted anywhere on the block." (Doc. 131 ¶ 6; Doc. 131, p. 49). From January 2015 to March 2016, staff at SCI-Huntingdon issued seventeen misconducts for inmate violations of the policy. (Doc. 104, ¶ 8).

DOC Administrative Directive 804 ("DC-ADM 804"), entitled "Inmate Grievance System," provides a multi-step administrative grievance appeal process that allows inmates to resolve problems by bringing concerns and complaints to the attention of prison officials. (Doc. 104, ¶¶ 9, 10; Doc. 135, ¶¶ 9, 10; Doc. 131, ¶ 10, 14; 133-1, ¶ 10, 14). The initial grievance must be submitted in writing to the Facility Grievance Coordinator on the grievance form available on all housing units and blocks, within fifteen working days after the event upon which the grievance is based. (Doc. 104, ¶ 12;

4

Doc. 131 ¶¶ 10, 12; 133-1, ¶¶ 10, 12). DC-ADM 804 sets forth the following requirements concerning the contents of the grievance:

> 11. The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim.
>
>     a. The statement of facts shall include the date, approximate time, and location of the event(s) that gave rise to the grievance.
>
>     b. The inmate shall identify individuals directly involved in the event(s).
>
>     c. The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.
>
>     d. If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.

(Doc. 104-3, p. 49, DC-ADM 804, § 1 (A)(11)(a)-(d)); Doc. 104, ¶ 13; Doc. 135, ¶ 13). Upon receipt, the Facility Grievance Coordinator refers the grievance to a staff member not involved in the event to provide a written response. (Doc. 104, ¶ 14; Doc. 135, ¶ 14).

If the inmate is dissatisfied with the initial review of his grievance, he may file an appeal of the decision with the Facility Manager within fifteen working days from the date of the initial review response. (Id. at 15; Id. at 15). The Facility Manager provides a written response which may uphold the initial review response, uphold the inmate, uphold in part/deny in part, dismiss or remand the grievance. (Id. at 16; Id. at 16). Upon receiving a decision from the Facility Manager, if dissatisfied with the Facility Manager's response, an inmate may, within fifteen working days, submit an appeal to the final level

of review, the Chief Grievance Officer, Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Id. at 17; Id. at 17). In considering the appeal, the SOIGA reviews all documents from all prior levels of review. (Id. at 18; Id. at 18). Only issues raised in both the original grievance and the appeal may be appealed to the final level. (Id. at 17 Id. at 17). The SOIGA may uphold the initial review response, uphold the inmate, uphold in part/deny in part, dismiss or remand the grievance. (Id. at 19; Id. at 19). The SOIGA maintains a complete record of all appeals of grievances submitted to its office, along with a complete record of the documentation submitted with the appeals, whether the grievance is addressed on the merits or rejected for procedural deficiencies. (Id. at 20; Id. at 20).

On March 18, 2013, Oliver filed Grievance 452213, which was described as a "Prob w/ Staff-Officer." (Doc. 104-3, p. 82; Doc. 131, ¶ 17). According to Oliver, the grievance complained that "COII Kyle selected prisoners who actively smoked and placed them in [his] assigned cell, and denied [his] repeated requests for a smoke-free cell assignment." (Doc. 131, ¶ 17; Doc. 133-1, ¶ 17). The SOIGA upheld denial of the grievance finding that Oliver failed to provide evidence to support his complaint "that SGT Kyle placed a cellmate with [him] who uses tobacco and [he] believe[d] it was intentionally to harass and oppress [him]" and that D Block staff declined to report excessive ETS. (Doc. 131, p. 20).

Oliver alleges that on March 20, 2015, he notified Defendant Treweek that he suffered a seizure due to ETS as a result of his cellmate smoking. (Doc. 104, ¶ 21; Doc. 135 ¶ 21). On March 22, 2015, he was reassigned from cell 1038 to cell 2016. (Id. at 22; Id. at 22). At 1000 hours, because he did not have a valid order for bottom bunk status, the housing unit contacted the medical department and the medical department reported that Oliver did not have an order for bottom tier status. (Doc. 104, ¶ 24). Oliver contends that this is incorrect as he was within an allotted "thirty (30) day 'grace period'". (Doc. 135, ¶ 23). Later that day, Oliver sought medical treatment for his seizure. (Doc. 104, ¶ 25). On March 23, 2015, he was evaluated for bottom bunk and bottom tier status. (Id. at 26). That same day, Defendant Michael Gomes, PA-C ("Gomes"), wrote an order restricting Oliver to bottom bunk and bottom tier status for a period of 180 days and Defendant Dr. Kollman ("Kollman") approved the order. (Doc. 104, ¶ 27; Doc. 135 ¶ 27; Doc. 131, ¶ 32; Doc. 133-1, ¶ 32). Also, on that same day, Oliver was issued Misconduct No. B727882 for Failure to Obey an Order in that he refused to return to his cell; he was escorted to the restricted housing unit ("RHU"). (Doc. 104, ¶ 29; Doc. 135, ¶ 29; Doc. 131. ¶ 26, Doc. 133-1, ¶ 26). The next day, following Defendant Oliver's approval, the Corrections Health Care Administrator ("CHCA") issued a memo to the RHU block sergeant, Oliver's Unit Manager, Oliver's counselor, Oliver, and Oliver's file, indicating that he was restricted to bottom bunk/bottom tier status until September 24, 2015. (Id. at 28; Id. at 28). Oliver did not file any grievances in March or April 2015. (Doc. 104, ¶ 30; Doc. 104-3, p. 81).

Oliver alleges that on December 15, 2015, Defendant Stevens assigned a known smoker to be his cellmate. (Doc. 104, ¶ 31; Doc. 135, ¶ 31; Doc. 131, ¶ 33). On that same date he reported to Defendant Yohn that he was experiencing symptoms related to ETS exposure; Defendant Yohn issued him a pass to seek medical treatment. (Id. at 32, 33; Id. at 32; Id. at 34, 35). Upon returning from the medical department, Oliver alleges he requested of Defendant Yohn, that he be placed in protective custody. (Id. at 35; Id. at 35; Id. at 36). Defendant Yohn ordered him to Center Control. (Id. at 36; Id. at 36; Id. at 37). He was then taken to the RHU. (Id. at 36; Id. at 36). Oliver indicates Yohn did not have him placed him in protective custody in the RHU but, rather, had him placed in pre-hearing confinement based on an alleged misconduct offense. (Doc. 135, ¶ 36). On December 15, 2015, Oliver was charged with Refusing to Obey an Order in Misconduct No. 89622. (Doc. 131, pp. 32-40). Specifically, he refused a direct order to accept a cell mate. (Id. at 40). Following a finding of guilt, he appealed to the Program Review Committee ("PRC") in accordance with DC-ADM 801. (Id. at 33). The PRC upheld the hearing examiner's determination. (Id.) It appears that he attempted to initiate another appeal on December 5, 2016. (Id. at 34). There is no record of disposition of this appeal.

DC-ADM-802 is the DOC's Administrative Custody ("AC") policy which provides that an inmate may be assigned to AC status and placed in a security level 5 housing unit upon request for self-confinement. (Id. at 37, 38; Id. at 37). An inmate who requests, and is granted, protective custody, is placed on AC status. (Doc. 104, ¶ 39). At SCI-Huntingdon, AC status inmates are housed in the RHU. (Id. at 40). Oliver contends

8

that AC status is not available to provide protection from ETS. (Doc. 135, ¶ 38). Oliver did not file any grievances in December 2015 or January 2016, which were appealed to the SOIGA for final review. (Doc. 104, ¶ 41; Doc. 104-3, p. 81).

On January 20, 2016, Oliver allegedly broached with Defendant Oliver the issue of ETS in his housing unit and his desire to be assigned single cell status. (Doc. 104, ¶ 42 ; Doc. 135, ¶ 42; Doc. 131, ¶ 43; Doc. 133-1, ¶ 43). On January 21, 2016, Defendant Stevens reassigned him to a second-tier cell. (Id. at 43, 45; Id. at 43, 45; Id. at 45; Id. at 45). Oliver did not have a valid order for bottom bunk or bottom tier status on January 21, 2016. (Doc. 104, ¶ 46). Oliver again challenges the accuracy of this statement contending that he was within an allotted thirty-day grace period. (Doc. 135, ¶ 46). On January 22, 2016, Oliver reported to the medical department with complaints of a seizure and, at some point, sought to have his housing status updated. (Doc. 104, ¶ 47, 48; Doc. 135 ¶ 47). He returned to the medical department on January 25, 2016, to follow up on his housing status and Defendant Mark McConnell PA-C ("McConnell") entered an order restricting him to bottom bunk, bottom tier status for 180 days. (Doc. 104, ¶ 49; Doc. 135 ¶ 49; Doc. 131, ¶ 48; Doc. 133-1, ¶ 48). All pertinent individuals were notified *via* a memo from the CHCA. (Doc. 104, ¶ 50; Doc. 135, ¶ 50). Oliver did not file any grievances in January or February 2016, that were appealed to the SOIGA. (Doc. 104, ¶ 51; Doc. 104-3, p. 81).

Oliver alleges that Defendant Oliver retaliated against him by concealing evidence of prisoners smoking and by having him confined to the RHU for the purpose of confiscating his legal materials and to prevent further litigation. (Doc. 104, ¶ 52; Doc. 135, ¶ 52). In Grievance 620304, filed on April 4, 2016, Oliver alleges he was placed in the RHU under false pretenses and denied access to his legal materials in retaliation for filing the instant civil action. (Doc. 104, ¶ 54). The content of the grievance is as follows:

> On 3/28/26, Grievant was conveyed to the RHU based upon false and/or misleading statements written in a DC-801 other repot in which it was claimed Grievant stated "he was threatened by 2 inmates." DC-801 Part 1, No. B864622. Grievant's property was then inventoried. RHU officers pack all Grievant's legal materials for his active criminal trial matters, appellate cases, and federal cases in two (2) legal boxes and issued a confiscated items receipt (CIR), No. B850344. Grievant is unable to access these materials despite having imminent deadlines and being scheduled for trial in the near future, thus prejudicing his cases. Confiscation was done in retaliation for filing an Environment Tobacco Smoke claim against facility. Grievant request that he be granted immediate access [indecipherable] trials, that he be authorized to have four (4) legal boxes for the six active cases he is pro se in. Grievant reserves the right to seek monetary damages and all other rights.

(Doc. 104-3, p. 87). Grievance 620304 does not allege that Defendant Oliver placed him in the RHU; it alleges that RHU officers confiscated his property. (Doc. 104, ¶ 57; Doc. 135 ¶ 57; Doc. 104-3, p. 87). Oliver contends the confiscation of his legal materials and review by the security department was "by 'order of'" Defendant Oliver. (Doc. 135, ¶ 59; Doc. 131, ¶ 50). In the initial review response dated April 4, 2016, denying the grievance, the grievance officer indicates that he interviewed CO1 Sullivan and CO1 Smith and that both officers indicated that they inventoried his property in accordance

with policy. (Doc. 104-3, p. 88). They denied being aware of Oliver's pending litigation and denied retaliating against him. (Id.). In his appeal, Oliver disagrees with the grievance officer's statement that CO1 Sullivan and CO1 Smith were unaware of his lawsuits and with their denial of retaliation. (Id. at 90). He further states that "staff and prisoners are aware of litigation, RHU officers expressed anger over Grievant filing grievances (and a lawsuit) against staff…" (Id.) The Facility Manager found the grievance to be without merit. (Id.) In his final appeal he stated that "[Superintendent] Tice denied Grievant's request for extra record storage boxes for legal storage solely because of his animosity towards Grievant as a result of civil litigation brought against him due to admitted violation of Grievant's civil rights related to the involuntary exposure to environmental tobacco smoke in the facility, and Tice's desire to hobble Grievant's litigation where his actions are in violation of state and federal law and Department policy." (Id. at 93). The SOIGA denied the appeal on July 5, 2016. (Id. at 81).

On April 5, 2016, Superintendent Tice authorized Oliver to possess two extra legal boxes for legal documents for a total of four storage boxes in his assigned cell for legal materials. (Doc. 104, ¶ 60; Doc. 135 ¶ 60). Any excess property is held in legal storage for Oliver. (Id.; Id.). He is permitted access to that material every thirty days. (Id.; Id.).

## III. Discussion

Defendants seek an entry of summary judgment based on Oliver's failure to properly exhaust his administrative remedies, as required by 42 U.S. C. § 1997e(a), prior to initiating this action. The Prison Litigation Reform Act of 1996 (the "PLRA") "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." Ross v. Blake, —U.S. —; 136 S. Ct. 1850, 1856 (2016); see Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). The text "suggests no limits on an inmate's obligation to exhaust– irrespective of 'special circumstances.'" Id. "And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. See Miller v. French, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion")." Id. at 1856-57.

Further, the PLRA mandates that an inmate "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules. Woodford v. Ngo, 548 U.S. 81, 92 (2006); Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir. 2004) (concluding that the PLRA includes a procedural default component); Rivera v. Pa. Dep't of Corr., 388 F.App'x 107, 108 (3d Cir. 2010) (stating "[a]n inmate must exhaust his administrative remedies prior to filing a

civil action in federal court."). Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court. See Spruill, 372 F.3d 218. "As for the failure to [ ] identify [the] named defendants on the grievance form, ... to the extent the identity of a defendant was 'a fact relevant to the claim,' Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And, ... in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA." Williams v. Pennsylvania Dep't of Corr., 146 F. App'x 554, 557 (3d Cir. 2005) (citing Spruill, 372 F.3d at 234).

Finally, whether an inmate has properly exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. See Small v. Camden County, 728 F.3d. 265, 268 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).[1]

A. Count One

In Count One, Oliver alleges that at various times in 2015, and in early 2016, the Commonwealth Defendants continuously involuntarily exposed him to ETS in violation of the Eighth Amendment. (Doc. 27, ¶¶ 35-90). Oliver did not file any grievances in March or April 2015, concerning the allegations that took place during March 20, 2015,

---

[1] In accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), the Court placed the parties on notice that it would consider exhaustion in its role as fact finder and afforded the parties the opportunity to be heard under Small, 728 F.3d at 268. (Doc. 73).

through March 23, 2015. (Doc. 104, ¶ 30; Doc. 104-3, p. 81). He failed to file any grievances raising the events of December 15, 2015, in December 2015 or January 2016, which were appealed to the SOIGA for final review. (Id. at 41; Id.). Nor did he file any grievances about the events occurred beginning January 20, 2016, through January 25, 2016, in January or February 2016 that were appealed to final review by the SOIGA. (Id. at 51; Id.). The record clearly demonstrates that he failed to exhaust his administrative remedies with regard to his Count One claims that, at various times in 2015, and in early 2016, Defendants continuously involuntarily exposed him to ETS in violation of the Eighth Amendment.

In an effort to overcome summary judgment, Oliver relies on the filing of Grievance 452213, which he filed on March 18, 2013. (Doc. 129, p. 3). However, as noted by Defendants (Doc. 133, p. 5), the Court dismissed the portions of Oliver's Amended Complaint concerning conduct that occurred in 2013, as being barred by the statute of limitations. (Doc. 88, pp. 7, 8; Doc. 89). The 2013 grievance is irrelevant.

With regard to the claim that he was involuntarily exposed to ETS on December 15, 2015, Oliver argues that because he was issued a misconduct, he was required to utilize the exhaustion process set forth in DC-ADM 801, not the grievance procedure contained in DC-ADM 804. (Doc. 129, pp. 4, 5). In support, he relies on DC-ADM 804 Section 1, A.7 which states that "[a] grievance directly related to a specific misconduct charge…will not be addressed through the Inmate Grievance System and must be

addressed through Department Policy DC-ADM 801." (Doc. 129, p. 4). The pertinent language contained in the version of DC-ADM 804 in effect at the relevant time is as follows: "Issues concerning a specific misconduct charge, conduct of hearing, statements written within a misconduct and/or other report, a specific disciplinary sanction, and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, 'Inmate Discipline' and/or DC-ADM 802, 'Administrative Custody Procedures.' Issue other than specified above must be addressed through the Inmate Grievance System." It is his position that the exhaustion of the DC-ADM 801 process satisfies the exhaustion of the ETS claim.

The DOC has three different administrative remedy processes which collectively provide an inmate a route to challenge every aspect of confinement. See Fortune v. Bitner, 2006 WL 2796158, at *7 (M.D. Pa. Sep. 25, 2006). Those policies are: (1) the Inmate Grievance Policy, DC-ADM 804; (2) the Inmate Discipline Policy, DC-ADM 801; and (3) the Administrative Custody policy, DC-ADM 802. See Pa. Dep't of Corr. Policies, https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx. The three programs address specific issues which may arise within the prison, and one administrative remedy may not be substituted for the other. Fortune, 2006 WL 2796158, at *7. An inmate who has received a misconduct citation, *i.e.* a violation of DOC rules and regulations with a resulting disciplinary measure, and seeks to appeal that misconduct or allege a grievance in connection with the events surrounding that

misconduct, must use DC-ADM 801. See id. DC-ADM 801. DC-ADM 802 is similar, but applies to inmates in administrative custody. See id. DC-ADM 802. DC-ADM 804 applies to all inmate grievances not connected with a misconduct citation. See id. DC-ADM 804. DC-ADM 801 establishes the process by which an inmate is disciplined for a violation of DOC rules and regulations. It is not the means to raise issues surrounding the conditions of an inmate's confinement and cannot satisfy the stringent administrative exhaustion requirements of such a claim.

Importantly, even if it were determined that, for some reason, exhaustion of the remedies set forth in DC-ADM 801, supplanted the DC-ADM 804 requirements in this instance, Oliver would not be able to overcome summary judgment because he failed to fully exhaust those procedures. The first level of appeal following a hearing examiner's finding of guilt on a misconduct charge is to the PRC. (DC-ADM 801, Section 5 A). The PRC's decision may then be appealed to the Facility Manager within seven calendar days of the receipt of the decision. (Id. at Section 5 B). The final level of appeal is to the Chief Hearing Examiner. Although it is clear that Oliver pursued an appeal with the PRC, there is no indication that the second appeal, submitted almost a year later, was ever submitted to, or considered by the Facility Manager. Nor is there any indication that he pursued the final level of appeal.

Based on the foregoing, Defendants' motion for summary judgment on the Eighth Amendment conditions of confinement claims contained in Count One will be granted.

B. Count Three

It is undisputed that Oliver fully exhausted Grievance 620304, wherein he alleged RHU officers confiscated his property in retaliation for his pursuit of this ETS action. It is also undisputed that he failed to identify Defendant Oliver as being directly involved in the conduct of which he complains. In his appeal to final review he identifies Superintendent Tice as the individual responsible for the confiscation of his property in retaliation for pursuit of his ETS claims. Defendant Oliver's name does not appear in any of Oliver's grievance documents.

As noted *supra*, the standard used in determining whether a prisoner has exhausted the administrative process is whether he properly exhausted by complying with applicable grievance procedures and rules. The relevant DOC policy and pertinent language states that "[t]he inmate shall identify individuals directly involved in the event(s)." (DC-ADM 804, § 1(A)(11)(b)). A similar provision in an earlier version of DC-ADM 804, required an inmate to name the individuals in the grievance against whom the inmate eventually brings suit. Spruill, 372 F.3d at 234. The version in effect at the relevant time is even more cogent as it now contains the mandatory language, "shall identify." (Doc. 68-1, p. 3, ¶ 5, p. 14; DC-ADM 804, § 1(A)(12)(b)). The Spruill Court explained that the purpose of the regulation is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing. Spruill, 372 F.3d at 234. "[I]t is clear, regardless of the purpose of the requirement, that Spruill requires the prisoner-grievant-plaintiff to name in the grievance those he eventually sues, upon pain of procedural

default." Hemingway v. Ellers, 2008 WL 3540526, at *11 (M.D. Pa. 2008) (citing Williams, 146 F.App'x. at 557; see also, Singleton v. Beadle, No. 3:17-CV-220, 2018 WL 1129300, at *3 (M.D. Pa. Feb. 26, 2018); McNesby v. Heenan, No. 3:CV-16-0602, 2017 WL 4418421, at *4 (M.D. Pa. Oct. 5, 2017).

Moreover, under Spruill, it is the plaintiff's burden to explain why he did not name a defendant in the grievance. See Spruill, 372 F.3d at 234 (noting that "Spruill did not [name Brown in his grievance], and has offered no explanation for his failure to do so"). Oliver offers no explanation for his decision not to identify Defendant Oliver as the individual who confiscated his property in retaliation for his pursuit of ETS claims. Consequently, Defendant Oliver is entitled to an entry of summary judgment on Count Three based on Oliver's failure to exhaust administrative remedies.

## IV. Conclusion

Based on the foregoing, Defendants' motion (Doc. 103) for summary judgment will be granted.

An appropriate Order will issue.

                          **BY THE COURT:**

                          **s/James M. Munley**
                          **JUDGE JAMES M. MUNLEY**
                          **United States District Court**