# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY EDWARD OLIVER , | : | |
| Plaintiff, | : | 3:16-cv-0407 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JOHN E. WETZEL, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM[1]

Anthony Edward Oliver ("Oliver"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), at all times relevant, housed at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"), Pennsylvania, filed the instant civil rights complaint pursuant to 42 U.S.C. § 1983, concerning his involuntary exposure to environmental tobacco smoke ("ETS"). (Doc. 1). The matter is proceeding *via* an amended complaint filed by Oliver on May 10, 2016. (Doc. 27).

Remaining Defendants include individuals who provided him with medical services, Dr. Kevin Kollman ("Kollman"), Mark McConnell, PA-C ("McConnell"), and Michael Gomes, PA-C ("Gomes") (hereinafter collectively referred to as "Medical Defendants"). Following disposition of motions to dismiss,

---

[1] This matter has been reassigned to the undersigned upon the untimely death of the Honorable James M. Munley.

the sole claim remaining against the Medical Defendants is the failure to administer adequate medical treatment for ETS exposure found in Count II. (Doc. 27, pp. 18, 19; Doc. 89, ¶ 3). The subject of this Memorandum is the Medical Defendants' motion (Doc. 100) for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion will be granted.

## I.    STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United*

*Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## II.    **STATEMENT OF MATERIAL FACTS**

At all times relevant, Oliver was incarcerated at SCI-Huntingdon and the Medical Defendants were employed by a medical contractor providing medical services to DOC inmates at SCI-Huntingdon.  (Doc. 102, ¶ 4).

When initially incarcerated in 1998, Oliver advised medical staff that he suffered from seizures and migraines as a result of a head injury he sustained in 1987. (*Id.* at 7; Doc. 174, ¶ 7).  He was prescribed medication for his migraines and seizures and placed on numerous medical restrictions secondary to his seizure disorder, including bottom bunk housing, no standing for over one-half hour, no working with machines, no climbing ladders, and only passive activities. (*Id.*; *Id.*). Over the next several years, Oliver reported nearly monthly incidences of severe headaches, photo-sensitivity, nausea, vertigo, and intermittent seizures (all of which were unobserved), for which he was prescribed a myriad of medications including Extra Strength Tylenol, Motrin, Voltaren, Excedrin, Naprosyn, Toradol, Cafergot, Elavil, Pamelor, Neurontin, and Midrin for migraines; Vistaril, Chlorpheniramine, and Claritin as an antihistamine; Phenergan for nausea; and Topamax, Tegretal, and Keppra for seizures.  (*Id.* at 8; *Id.* at 8).  By June of 2005, he reported to the medical department that he was often too sick with migraines to get out of bed, notwithstanding the various migraine medications prescribed to him. (*Id.* at 9; *Id.* at 9).

In July 2005, Oliver's mother called the prison and expressed her concerned about her recent telephone calls, during which he reported that he was suffering from severe nosebleeds, headaches, blackouts, and seizures. (*Id.*; *Id.*). In 2006, he continued to report daily headaches and auras, and occasional unwitnessed seizures, including seventeen seizures over a 21-day period in August 2006. (*Id.* at 10; *Id.* at 10). His medications were adjusted in an attempt to better control his seizures and migraines. (*Id.*; *Id.*). In 2007, he continued to report frequent migraines, with as many as three migraines per week, and photo sensitivity induced by the migraines, which he felt were made worse by noise. (*Id.* at 11; *Id.* at 11).

On April 16, 2007, Dr. John Symons wrote, "Frankly, I am not optimistic any tx would work. Will see if I can get a new prescription from neurology." (Doc. 102, ¶ 11). Thereafter, he was prescribed Neurontin for his headaches, and was provided with prescription sunglasses for his photo sensitivity. (*Id.*). He continued to complain of frequent migraines. (*Id.*) In 2008, he continued to report occasional seizures, and frequent migraines, despite the prescription medications. (*Id.* at 12; Doc. 174, ¶ 12). Once again, his medications were adjusted in an attempt to find a more efficacious solution to his symptoms. (Doc. 102, ¶ 12). In May 2008, he sought medical restriction which would prevent requiring him to work around fluorescent lights and loud noises since they triggered his headaches.

(*Id.*).  In May 2009, he was paroled.  At no time between 1998 and 2009 did he complain of ETS exposure, or otherwise suggest his medical complaints were related to second hand smoke.  (*Id.* at 13).

In December 2011, Oliver returned to the custody of the DOC.  (*Id.* at 14; Doc. 174, ¶ 14).  On March 2, 2012, he reported to Linda Deibert, PA-C during a sick call visit, that he suffered from migraines four to five times a week.  (*Id.* at 15).  He was unable to provide the name of the migraine prescription medications or his treating doctors because he did not have on his person the medical documents, which according to him, spanned almost twenty-five years.  (*Id.* at 15; Doc. 174, ¶ 15).  The plan at that time was to prescribe Excedrin sparingly.  (Doc. 102, ¶ 15).  The following week he reported that he had been suffering from migraines since he was a teenager and was now suffering three to four headaches per week, with photo sensitivity, nausea, and occasional vomiting. (*Id.* at 16; Doc. 174, ¶ 16).  He indicated that he was prescribed Topamax while in county jail and that a decrease in his evening dose brought increased headaches.  (*Id.*; *Id.*).  The Topamax was increased.  (*Id.*; *Id.*).  On March 12, 2012, he was medically cleared for transfer to SCI-Huntingdon.  (*Id.* at 17; *Id.* at 17).

He filed his first formal grievance complaining that corrections officers were refusing to enforce the prison's non-smoking policy in February 2013.  (*Id.* at 19).  His first complaint to the medical department came one month later.  (*Id.* at 18).

Prior to these complaints, he was regularly seen in sick call for migraines, nausea, vomiting, and a seizure that he attributed to an allergic reaction; he made no mention of cigarette smoke. (*Id.* at 18, 19). Oliver disputes these dates stating that he reported involuntary ETS exposure to prison staff and medical staff immediately upon his arrival at SCI-Huntingdon. (Doc. 174, ¶¶ 18-21). There is no support in the record for these statements.

On March 7, 2013, Oliver was seen in the Chronic Care Clinic for his seizure disorder and his prescriptions for Extra Strength Tylenol for the headaches and Topamax for the seizures were renewed. (*Id.* at 20). He states he reported involuntary ETS exposure at this time; there is no support in the record for this statement. (Doc. 174, ¶ 20). On March 12, 2013, Oliver reported to a nurse that he began experiencing a headache the night before, which he attributed to his cellmate's smoking. (Doc. 102, ¶ 21; Doc. 174, ¶ 21;). The nurse administered Phenergan for nausea and Tylenol, pursuant to active standing orders, and advised him to sign up for sick call the following day so he could be examined by a physician or physician's assistant. (Doc. 102, ¶ 21). She instructed him "to talk to block officer about cellie smoking/informed CO." (*Id.*; Doc. 174, ¶ 21). Although he signed up for sick call to address his complaints that having smokers in his cell were causing headaches, because he refused to sign the cash slip when he was

called to the medical department on March 13, 2013, and March 16, 2013, he was not seen. (*Id.* at 22, 24).

At sick call on March 21, 2013, he reported to Physician's Assistant Chew ("PA Chew") that he was seeking to be single-celled because of increased "headaches and seizure activity due to smoking on block or from cellmate, although current cellmate does not smoke." (*Id.* at 25; Doc. 174, ¶ 25). When PA Chew advised him to speak with the block officer about the smoking, he indicated that the block officer informed him that it was difficult to enforce the no-smoking policy unless a prisoner was caught actively smoking. (*Id.*; *Id.*). PA Chew informed him that moving to a single cell would be ineffective without the enforcement of the no-smoking policy because there was no way to guarantee that smoke would not come into the single cell. (*Id.*; *Id.*). Consequently, she could not give him a single cell medical accommodation. (*Id.*; *Id.*). She suggested he speak with security about enforcing the policy. (*Id.*; *Id.*).

On March 27, 2013, Oliver again complained to PA Chew of migraines, vomiting, and lightheadedness secondary to ETS exposure and reiterated his request to be moved to a single cell. (Doc. 102, ¶ 26; Doc. 174, ¶ 26). PA Chew offered him additional medications, advised him that medical cannot move him to a block for "less smoke" because the facility was a non-smoking facility, and suggested that he speak to prison security and the Correctional Health Care

administrator concerning enforcement of the smoking policy. (*Id.*; *Id.*). He refused the offer of Excedrin based on his allergy to NSAIDs and declined saline solution as an alternate treatment because "it is not indicated as a treatment for emergent symptoms as a result of exposure to ETS." (*Id.*; *Id.*).

On June 12, 2013, he reported to a nurse that smoke from nearby cells was triggering migraine headaches. (*Id.* at 29; *Id.* at 29). It was noted that he was taking Tylenol for migraines and he was offered Pepto Bismol for his nausea. (*Id.*; *Id.*). He was advised to sign up for sick call the following morning; he failed to appear. (*Id.*; *Id.*).

On November 18, 2013, Oliver reported to the medical department indicating that he suffered an unwitnessed seizure the previous evening. (*Id.* at 30; *Id.* at 30). An examination revealed no injuries caused by the seizure. (Id.; Id.). He did not report that the seizure was caused by ETS. (*Id.*; *Id.*). The nurse noted that he had refused to take his seizure medication over the weekend and, when she counseled him on medication compliance, he became argumentative and blamed the kitchen for not providing him with adequate meals to take his medication. (*Id.*; *Id.*). He was advised to follow-up with the medical department as needed. (*Id.*; *Id.*).

On December 6, 2013, Oliver was seen by Defendant Gomes, who wrote: "Patient requesting med renewal. OA: Migraines, allergic rhinitis, dry skin

dermatitis. P: Switch from CTMs to Claritin. . .Tylenol and AmLactin as directed.

F/u prn." (*Id.* at 31; *Id.* at 31). In addition to prescribing Claritin, his prescriptions

for migraine and seizure mediations were renewed. (*Id.*; *Id.*). He was seen by

Defendant Gomes on December 19, 2013, at Chronic Care Clinic. (*Id.* at 32; *Id.* at

32). He reported no new seizure activity since November 2013. (Id.; Id.). No

change was made to his medications. (*Id.*; *Id.*).

He made multiple visits to the medical department over the next several

months, with no complaints of seizures, migraines, or cigarette smoke. (*Id.* at 33;

*Id.* at 33). Oliver states that he made several complaints to medical staff during

this time frame. (Doc. 174, ¶ 33). He provides no support for this statement.

While temporarily housed at the State Correctional Institution at Graterford,

("SCI-Graterford) between the dates of March 6 and March 18, 2014, Oliver was

placed in a psychiatric observation cell. (Doc. 102, ¶ 34; Doc. 174, ¶ 34). Oliver

informed a nurse at SCI-Graterford that he had a seizure after falling from his top

bunk the previous day and that he had experienced migraines since the fall. (*Id.* at

34, 35; *Id.* at 35). He advised the nurse and Dr. Golsorkhi that he thought his

seizure was caused by "not getting the proper diet" and not receiving his seizure

medications for several days while in the psychiatric observation cell. (*Id.*; *Id.*).

Medical staff at SCI-Graterford confirmed the seizure was a result of him not

receiving his anti-seizure medication. (Doc. 174, ¶ 35). On March 28, 2014, upon

his return to SCI-Huntingdon, Oliver was seen in the medical department on "new man line" by Defendant Gomes; his medications were renewed.  (Doc. 102, ¶ 36; Doc. 174, ¶ 36).

On May 20, 2014, Oliver complained to Defendant Gomes of worsening migraines which he believed were precipitated by second hand cigarette smoke. (*Id.* at 37; *Id.* at 37).  Defendant Gomes reviewed the chart and noted that he was taking a high dose of Topomax for his seizures, and Tylenol three times per day for his migraines.  (*Id.*; *Id.*).  Because he experienced stomach pain when taking aspirin and NSAIDs in the past, and had an abnormal CBC count, Defendant Gomes opted to "cautiously increase" his Tylenol from one to two pills, three times per day and encouraged him to return as scheduled or sooner if his headaches worsened.  (*Id.*; *Id.*).

Over the course of the next few months, he was seen by Defendants Gomes and McConnel for treatment of migraines and seizures. (*Id.* at 38-41; *Id.* at 38-41). There were no complaints of ETS exposure.  (*Id.*; *Id.*).

On July 18, 2014, Oliver reported to Defendant Kollman that he had a seizure the previous evening and that he believed his recurrent seizures were triggered by tobacco smoke exposure. (*Id.* at 42; *Id.* at 42).  Defendant Kollman continued Oliver's seizure medications and wrote an order for a "smoke-free environment."  (*Id.*; *Id.*).  The order was discontinued the same day after Defendant

Kollman was advised by the DOC that such a request was "not under the review of medical." (*Id.*; *Id.*).

During the following eight months, Oliver was seen by the medical department for his dermatitis; he did not complain of migraines or seizures, and he did not raise the issue of exposure to cigarette smoke. (*Id.* at 43; *Id.* at 43). His medication regimen continued. (*Id.*; *Id.*).

On March 22, 2015, Oliver advised nursing that he had again been placed in a cell, on a top bunk, with a smoker. (*Id.* at 44; Id. at 44). Since March 20, 2015, he had experienced two unwitnessed seizures without injury. (*Id.*; *Id.*). When the nurse called the block officer to inquire why he did not have a bottom bunk, she was advised that there was no order for a bottom bunk. (*Id.*; *Id.*). The nurse advised Oliver to sign up for sick call to discuss bottom bunk renewal with a physician assistant. (*Id.*; *Id.*). The following morning, after seeing Oliver, Defendant Gomes continued his seizure medication and ordered bottom bunk/bottom tier housing accommodations. (*Id.* at 45; *Id.* at 45). That same day, Plaintiff was placed in the Restricted Housing Unit ("RHU") by psychiatry for an unconfirmed reason. (Doc. 102, ¶ 45).

Between March 25, 2015, and April 21, 2015, the records indicate that Oliver was non-compliant with seizure medication on a nearly daily basis. (Doc. 102, ¶ 46). During this time period, there are no documented complaints in the

medical records of seizures, migraines, or exposure to cigarette smoke. (Doc. 102; ¶ 47).

At his June 30, 2015 Chronic Care Clinic appointment, Oliver advised Defendant Kollman that he had experienced a seizure on June 7, 2015, while he was temporarily housed at SCI-Graterford, which he felt was caused by ETS exposure. (Doc. 102, ¶ 48; Doc. 174, ¶ 48). His neurological examination was normal; his medication regimen was continued. (*Id.*; *Id.*).

Oliver next alerted the medical department of ETS exposure on December 15, 2015, when he complained that his cellmate was a smoker. (Doc. 102, ¶ 50). He indicated compliance with the seizure medication and reported having no seizures for two or more weeks. (*Id.*). To accommodate him, an order was written by a nurse, and approved by Defendant Kollman, for him to be placed in the Restricted Housing Unit ("RHU"), where he claimed that the no-smoking policy was strictly enforced. (*Id.*).

Following his January 15, 2016 release from the RHU, at Oliver's request, on January 20, 2016, he was placed in the RHU on the second tier. (*Id*. at 53). Oliver raised the issue of the medical order restricting housing to the bottom bunk/bottom tier with a corrections officer. (*Id.*). The officer advised him to sign up for sick call to confirm his medical restrictions. (*Id.*).

On January 22, 2016, Oliver reported that he suffered from a seizure the previous evening. (*Id.* at 54). An examination revealed that his cranial nerves were intact. (*Id.*; (*Id.*). Defendant McConnell discussed medication compliance with Oliver and ordered laboratory tests to check his seizure medication levels. (*Id.*; *Id.*). Oliver did not discuss his housing accommodations with Defendant McConnell. (*Id.*; *Id.*). On January 25, 2016, he sought an update to his housing status. (*Id.* at 55; *Id.* at 55). His medical restrictions were updated to include bottom bunk/bottom tier housing. (*Id.*; *Id.*).

On March 29, 2016, Oliver reported to Defendant Gomes that he had a migraine for a couple days, which he felt was related to exposure to second hand cigarette smoke when he was in population a few days earlier. (*Id.* at 56; *Id.* at 56). He continued to feel nauseous. (*Id.*; *Id.*). He was advised to rest, increase clear liquids, eat bland foods, and take Phenergan for nausea as directed. (*Id.*; *Id.*).

In the following months, Oliver was seen in sick call numerous times for various complaints unrelated to seizures or migraines, and in the "new man line" upon his return from SCI-Graterford on September 2, 2016. (*Id.* at 57-61: Doc. 174, ¶¶ 57-61). His bottom bunk, bottom tier housing status based on medical accommodations continued as did his medicine regimen. (*Id.*; *Id.*). On September 2, 2016, Defendant Gomes documented "last recalled seizure was July 2016 per patient." (Doc. 102, ¶ 62).

On September 16, 2016, he reported to Defendant Gomes that he suffered a seizure and migraine the previous day, which he believed was the result of cigarette smoke exposure. (*Id.* at 63; Doc. 174, ¶ 63). He requested either that he be prescribed a different medication for his migraines and seizures, or that an order be written so that he was not house around anyone who smoked. (*Id.*; *Id.*). Defendant Gomes' examination of Oliver was normal; he was not in acute distress, he was walking and talking normally, and no neurological deficits were observed. (*Id.*; *Id.*). Defendant Gomes did not believe a change in medications was warranted. (*Id.*; *Id.*). He advised Oliver to "f/u with security about ensuring that [the] no tobacco policy of [the] institution is being enforced on his block." (*Id.*).

The following month, Oliver was seen by Dr. Barry Eisenberg ("Dr. Eisenberg") regarding his history of migraines and seizures, *inter alia*. (*Id.* at 66). He informed Dr. Eisenberg that ETS was a trigger to these symptoms. (*Id.*; *Id.*). Oliver's medical examination was normal. (*Id.*; *Id.*). Eisenberg advised him to "[r]emove himself from cigarette smoke if possible." (*Id.*; *Id.*). He also prescribed another seizure medication, Keppra, in addition to Topamax, in an attempt to further limit his seizures. (*Id.*; *Id.*).

On October 25, 2016, Oliver reported to the medical department that he was experiencing hallucinations and bad dreams, which he believed were the result of his seizure medication. (Doc. 102, ¶ 67; Doc. 174 ¶ 67). Defendant Kollman saw

him the next day and explained that that they could either discontinue the Keppra or give it more time to see whether the dreams lessened. (*Id.* at 68; *Id.* at 68). He chose to give it more time. For the next several months the medical department continued to work with Oliver in an effort to address issues with seizure medication, blurry vision, and sleep deprivation. (*Id.* at 69-71; *Id.* at 69-71).

On March 6, 2017, Oliver was seen by Dr. Shilito at Chronic Care Clinic for his regularly scheduled assessment of his seizure disorder. (*Id.* at 73; *Id.* at 73). He conveyed to Dr. Shilito that his last seizure was five days earlier. (*Id.*; *Id.*). He reported that he experienced four to six seizures per month but did not make medical aware of the seizures when they occurred. (*Id.*; *Id.*). He acknowledged that he was now in a cell by himself but reported that smoke from indoor smoking entered his cell and triggered his seizures. (*Id.*; *Id.*). Dr. Shilito planned to increase the Keppra and, after a follow-up assessment, would consider a neurological evaluation. ((*Id.*; *Id.*). Four days later, Oliver complained that the increased dose of Keppra was making him feel tired and asked to return to his previous dose of 750mg twice daily. (*Id.* at 74; *Id.* at 74). His request was accommodated. (*Id.*; *Id.*).

On April 6, 2017, during his follow-up appointment with Dr. Shilito, Oliver reported that he experienced one seizure in the past two weeks and that he continued to feel tired while taking Keppra. (Doc. 102, ¶75). Oliver disputes that

he only experienced one seizure in the two-week time period asserting that he reported his seizure activity to guards who instructed him to sign up for sick call. (Doc. 174, ¶ 75). Dr. Shilito advised him to return if the seizures increased. (Doc. 102, ¶ 75).

On May 1, 2017, Oliver was seen in sick call complaining of pain to his arm and back, after suffering an unwitnessed and unreported seizure two days earlier. (Doc. 102, ¶76; Doc. 174, ¶ 76). Defendant Gomes learned that Oliver was recently prescribed a new psychiatric medication for anxiety due to his seizures that can cause a decrease in blood pressure, and he felt "it sounded more like [he] may've suffered a near syncope episode" and not a seizure. (*Id.*; *Id.*). Over the course of the next two weeks, he was seen in medical a few times to address complaints of falls sustained as a result of the side effects of dizziness and lightheadedness he was experiencing from the new psychiatric medication. (*Id.*; *Id.*).

Between June and October of 2017, Oliver was treated on numerous occasions for medical complaints unrelated to his seizures or migraines. (Doc. 102, ¶ 77). As of October 2017, Oliver's prescriptions for Keppra, his seizure medication, Vistaril and Claritin, his allergy medications, Extra Strength Tylenol for his migraines and Phenergan for nausea, remained active. (*Id.* at 78: Doc. 174, ¶ 78).

Defendant Kollman declares that, because he is not an employee of the DOC, he has no authority or ability to make administrative, correctional or security decisions relative to an inmate's concerns of exposure to second hand smoke and no authority or ability to enforce the DOC's no smoking policy. (Doc. 100-2, ¶¶ 3, 5). Nor does he have authority to recommend a transfer from one facility to another. (*Id.* at 11). He indicates that although he can make recommendations for single cell, bottom bunk and bottom tier housing assignments based on medical need, due to limited availability, the DOC makes all final housing assignments. (*Id.* at 6, 7). He states "[b]ecause S.C.I.-Huntingdon is supposed to be a 'smoke-free' prison, it would be impossible for me to determine which housing blocks contain more inmates who smoke. Therefore, even if a patient requested a transfer to another housing block due to concerns of second hand smoke exposure (which, again, I am not authorized to do by the [DOC]), I would have no way of knowing which housing block includes fewer smokers. Moreover, the number of smokers on any given housing block is subject to change as inmates are frequently relocated from one block to another." (*Id.* at 9, 10). He is only permitted or authorized to treat an inmate's symptoms or underlying disease, encourage the inmate to avoid areas with increased second-hand smoke, and encourage the inmate to speak with the corrections officers about enforcing the No Smoking Policy.

## III.  DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Thus, § 1983 limits liability to persons who violate constitutional rights.

For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." *Natale v. Camden*

*Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse*, 182 F.3d at 197. Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). A "failure to provide adequate care ... [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993*); Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

Oliver seeks to hold the Medical Defendants liable based on their alleged failure to address his complaints that exposure to ETS exacerbated his underlying

medical conditions.  It is undisputed that Oliver suffered from seizures and

migraines as a result of a head injury he sustained in 1987.  On July 18, 2014,

Oliver reported to Defendant Kollman that he had a seizure the previous evening

and that he believed his recurrent seizures were triggered by tobacco smoke

exposure.  (Doc. 102, ¶ 42).  Defendant Kollman continued Oliver's seizure

medications and wrote an order for a smoke-free environment.  However, he

discontinued the order the same day after being advised by the DOC that such a

request was "not under the review of medical."  (*Id.* at 42).

In his declaration, Kollman represents that because of the limitations

imposed by the DOC, medical providers are "only permitted and/or authorized to

do the following: (1) treat the patient's symptoms and/or underlying disease; (2)

encourage the patient to avoid areas with increased second hand smoke; and (3)

encourage the patient to speak with the corrections officers about enforcing the No

Smoking Policy."  (Doc. 100-2, p. 3, ¶12).  Kollman explains that medical

providers are qualified only to treat a patient's symptoms and/or underlying disease

of the patient.  (*Id.* at 4).  They have no authority to "make administrative,

correctional, and/or security decisions relative to a patient's concerns of second

hand smoke."  (*Id.* at 5).  While they can make medical recommendations

regarding single cell and bunk and/or bottom tier assignments, it is limited to

recommendations.  The final decision is made by the DOC. Significantly, the DOC

"does not allow the contract medical providers to dictate any other aspect of an inmate's housing assignment(s), including the specific correctional facility or housing block of the inmate." (*Id.* at 8).

Kollman also describes the challenges presented by SCI-Huntingdon's designation as a "smoke-free" prison. (*Id.* at 9). He indicates that "even if a patient requested a transfer to another housing block due to concerns of second hand smoke exposure (which, again, [he is] not authorized to do by the [DOC]), [he] would have no way of knowing which housing block includes fewer smokers." (*Id.*). "The same is true of recommendations for an inmate to transfer to other facilities. [He is] not authorized by the [DOC] to recommend an intra-facility transfer, and more importantly, [he has] no knowledge which State Correctional Facility houses the fewest number of smokers." (*Id.* at 11).

Guided by the limitations imposed by the above parameters, Defendants rendered medical care during routine medical appointments, through the Chronic Care Clinic, and *via* sick call requests. Oliver's medical records demonstrate that he received consistent medical attention and treatment concerning his preexisting conditions as well as a myriad of maladies from which he suffered. The Medical Defendants made attempts to adjust his medications given his expressions of symptoms and made recommendations to him in an effort to improve his overall health. They approved his bottom bunk/bottom tier status, recommended that he

23

avoid the second-hand smoke, repeatedly reminded him that they had no authority to make changes to his environment, and advised him to raise the second-hand smoke issue with the appropriate prison officials.

It is clear that, in making consistent and diligent efforts to address his multiple complaints and conditions and to provide him guidance with regard to his environment, Defendants unquestionably complied with Eighth Amendment standards governing the adequacy of medical care. As such, they are entitled to an entry of summary judgment.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, Defendants' motion (Doc. 100) for summary judgment will be granted.

An appropriate Order will issue.